# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| MULE Engineering, Inc. ) | ASBCA Nos. 60854, 60967, 60968 |
| ) | 60970, 60971, 60972 |
| Under Contract No. W9124M-14-C-0014 ) | 60973, 60976 |

APPEARANCE FOR THE APPELLANT: Leonard W. Childs, Jr., Esq.
 Childs & Associates
 Savannah, GA

APPEARANCES FOR THE GOVERNMENT: Raymond M. Saunders, Esq.
 Army Chief Trial Attorney
 LTC Joseph J. Jankunis, JA
 CPT Harry M. Parent, JA
 Trial Attorneys

## OPINION BY ADMINISTRATIVE JUDGE HARTMAN

In these eight expedited appeals pursuant to Rule 12.2,* the appellant asserts that, while performing a construction contract for the Department of the Army, its work was delayed by the Army and it incurred additional expenses due to constructive changes arising from defective contract specifications. The Army asserts appellant is not entitled to recover any monies because (1) any delays caused by the Army were concurrent with delays caused by appellant, (2) contract specifications cited by appellant were not defective, and (3) when an error did occur on a drawing it was "patent," requiring inquiry by the appellant before it could rely on the drawing in bidding.

## FINDINGS OF FACT

In August 2014, the Department of the Army issued a solicitation for bids that was set aside for bids from 100% Service Disabled Veteran Owned Small Businesses to construct an addition to Building 7902, a hangar located on Hunter Army Airfield, Savannah, Georgia. The hangar building addition was to: consist of pre-engineered metal building framing members and metal roofing and siding panels; be "built on a structural concrete foundation" with a "finished" concrete floor; possess an eave height of 19 feet with exposed ductwork and insulation; contain a workable heating, ventilation and air conditioning (HVAC) system; and have standard doors for use of personnel and varying-sized overhead-coiling doors. (R4, tab 1 at 6-9)

---

* A decision under Board Rule 12.2 shall not have value as precedent, and in the absence of fraud, shall be final and conclusive and may not be appealed or set aside.

The Army solicitation expressly incorporated 29 drawings labeled "Building Extension, Building 7902," which stated at the very bottom "FOR CONSTRUCTION 05/05/2014." Sheet 4 of the drawings depicted a sanitary sewer line and manhole cover located within the footprint of the solicited addition to Building 7902. While this sheet showed demolition and saw cutting of existing concrete pavement for a proposed rerouting of the sewer line at a 90 degree, rather than 45 degree, angle, the sheet stated that "All DEMOLITION WORK SHOWN ON THIS DRAWING SHALL ONLY BE PERFORMED AS A BID ALTERNATE WITH APPROVAL BY THE OWNER'S PROJECT MANAGER." Sheet 5 of the drawings depicted a sewer line rerouted at a 90 degree angle with a new manhole outside the footprint of the metal building, but stated "ALL CONSTRUCTION WORK SHOWN ON THIS DRAWING SHALL ONLY BE PERFORMED AS A BID ALTERNATE WITH APPROVAL BY OWNER'S PROJECT MANAGER." (R4, tab 2; tr. 1/17)

With respect to overhead coiling doors, drawing sheet 8 contained the "FLOOR PLAN" for the addition to Building 7902. The sheet noted the location of a "NEW 33'-0" WIDE X 16' HIGH OVERHEAD COILING DOOR." (R4, tab 2 at 8) Sheet 9 of the drawings set forth the "REFLECTED CEILING PLAN" for the building addition. This sheet similarly noted the location for the "NEW 33'-0" WIDE X 16' HIGH OVERHEAD COILING DOOR." (R4, tab 2 at 9) Section 08 3323 of the contract set forth specifications for the coiling doors and stated such doors were to be installed in accordance with manufacturer's instructions and the contractor should "verify that opening sizes, tolerances and conditions are acceptable" (R4, tab 5 at 24-25).

With respect to concrete curbing to be installed, drawing sheet 11, figure C1, south elevation, contained a detail in the southwest corner indicating the "GRADE@CORNER" is + or – 34.43 feet above a fixed point. Similarly, the sheet contained a detail in the southeast corner indicating the "GRADE@CORNER" is + or – 33.67 feet above the same fixed point. Figure C1 depicted the concrete curb as a straight line that accounted for elevation change running from the lower southwest corner to the lower southeast corner of the building. Immediately above the "GRADE@CORNER" details, figure C1 stated in each corner that the "TOP OF CURB" is typically 35.10 feet above the same fixed point used to measure "GRADE@CORNER." (Tr. 1/351-52, 2/187; R4, tab 2 at 11) Drawing sheet 12, figure "A1," East Elevation, stated in the northeast corner the "GRADE@POINT OF CONNECTION" to the existing structure is + or – 34.74 feet above a fixed point. Similarly, figure A1 stated the "GRADE@CORNER" is + or – 33.67 feet above the same fixed point. Figure "A1" also depicted the concrete curb as a straight line that accounted for elevation changes running from the point of connection in the lower northeast corner to the lower southeast corner of the building. Immediately above the "GRADE@CORNER" and "GRADE@POINT OF CONNECTION" details, figure A1 included a statement in each corner that "TOP OF CURB" is typically 35.10 feet above the same fixed point used to measure the "GRADE @ CORNER" and "GRADE@POINT OF CONNECTION." (Tr. 1/355-56, 2/188; R4, tab 2 at 12) Sheet 14, figure "A1," Sidewall Metal Siding

2

Section, contained a straight line depicting the concrete curb and stated the "TOP OF CURB" is 35.10 feet above a fixed point. Beneath the concrete curb is a second bold font straight line entitled, "EXTERIOR CONCRETE." At the end of the bold font exterior concrete line are the words "EXIST. GRADE VARIES." Between the straight line depicting curb and the bold font straight line depicting the exterior concrete, figure A1 stated "DISTANCE FROM TOP OF CURB TO EXTERIOR CONCRETE VARIES." (Tr. 1/356-58, 2/188-89; R4, tab 2 at 14) Drawing sheet 18, figure SB101, Foundation Plan – Base Bid, stated "NEW 6" X 12" CONCRETE CURB, TYP" (R4, tab 2 at 18). During trial, appellant MULE Engineering, Inc.'s (MULE's) CEO testified that sheet 18 and other contract drawings required MULE to pour a concrete curb that was 6 to 12 inches in height (tr. 1/157-58, 164, 353, 354, 357-60).

Sheet 20 of the drawings set forth the "ROOF FRAMING PLAN" for the addition to building 7902. As both MULE's project superintendent and the Army's in-house architect who reviewed the drawings before solicitation of bids testified at trial, drawing sheet 20 contained a detail (horizontal hash marks similar in appearance to a horizontal "H") indicating that the building addition's northeast corner required the installation of a column. Further, along the east wall of the addition (from the southeast corner to the northeast corner) there were four similar sets of hash marks with each set indicating the need to install a column too. While the northeast corner column appeared upon the "framing" plan, it did not appear on drawing sheet 18, the "FOUNDATION PLAN," because (unlike the southeast corner column appearing on sheet 18) the northeast column did not require installation of a concrete footer and pedestal. (R4, tab 2 at 18, 20, tab 64 at 6; tr. 1/297-303, 2/125, 189-90, 202-04, 211-12)

The "Munters" dehumidification unit specified for the addition was depicted on the Mechanical, Floor, and Roof plans. While the Floor and Roof plans showed the unit with the return air duct on the left side or western side (R4, tab 2 at 8, 10), the Mechanical Plan showed the configuration of the unit with the return air duct on the right or eastern side (*id.* at 22). The Munters unit orientation in the Floor and Roof Plans is the "complete opposite" of the unit orientation in the Mechanical plan (tr. 1/312). The two representations "absolutely" do not look anything alike and, according to MULE's CEO at trial, there was a "big time" glaring difference between the drawings (tr. 1/312, 316).

On 19 August 2014, the Army hosted a site visit at building 7902 for interested bidders (R4, tab 1 at 1, tab 3 at 1-3, 10). Subsequently, on 9 September 2014, the Army issued Amendment No. 0001 to the solicitation to reflect the questions, answers, and clarifications that resulted from the site visit. The amendment stated in response to two questions from prospective bidders that the sanitary sewer line and manhole cover "Bid Alternate has been eliminated." (R4, tab 3 at 3, tab 5 at 4-5; tr. 1/41-43, 206-07)

While appellant, MULE began performing construction contracts only in 2013, its chief executive officer (CEO) was a graduate of West Point with a concentration in

3

mechanical engineering who had served in the Corps of Engineers performing and supervising civil engineering work in locations such as Bosnia, Kuwait, Iraq, and Afghanistan, and who had worked for government contractors doing projects all over the world, including "running" a $200 million Corps of Engineers contract for the restoration of the levee system after Hurricane Katrina (tr. 1/8-10). MULE's CEO prepared its bid for the solicited work with the assistance of a part-time estimator. MULE's bid anticipated subcontractors would perform at least 75 to 80% of the contract work, including the metal building and concrete work because MULE was not capable of performing such work at the time. According to the CEO, the part-time estimator obtained either an oral or written quote to perform the metal building and concrete work from a firm in Sarasota, Florida, named "PEMB." PEMB was to assemble and erect a metal building which was manufactured by "Trident." MULE, however, presented no contemporaneous written documentation of such a quote or contact information for PEMB such as an address, phone number or email for inclusion in the record here. (Tr. 1/96-97, 197-98, 200-02, 209, 210, 227-28; R4, tab 401 at 32-35, 40-43)

On 26 September 2014, the Army awarded a firm-fixed-price contract in the amount of $827,023.78 to MULE to construct the addition to the hangar and perform related hangar renovation work. The contract, No. W9124M-14-C-0014, required MULE to start work within 10 calendar days of receiving the notice to proceed (NTP) and to complete contract performance within 180 calendar days of the NTP. Section J of the contract stated MULE was to furnish the Army 17 submittals for review, 13 of which pertained to the metal building system, "15 calendar days after award." With respect to the metal building system manufacturer, the contract stated qualifications required were a manufacturer "regularly engaged for past 10 years in manufacture of metal building systems of similar type to that specified" and "[a]ccredited based on IAS Accreditation Criteria AC 472." The parties' contract incorporated by reference Federal Acquisition Regulation (FAR) 52.222-11(d)(1), SUBCONTRACTS (LABOR STANDARDS) (MAY 2014) requiring the submission of Standard Form 1413, Statement and Acknowledgement – Subcontractors, "[w]ithin 14 days after award of the contract" and "[w]ithin 14 days after the award of any subsequently awarded subcontract." The contract also incorporated by reference FAR 52.236-15, SCHEDULES FOR CONSTRUCTION CONTRACTS (APR 1984), and required MULE submit to the Army a progress schedule prior to commencing contract work. (R4, tab 5 at 1-4, 29, 48, 52, 53, 67-68)

On 10 November 2014, MULE submitted a contract progress schedule and the Army approved that schedule on 13 November 2014. This schedule indicated that construction would be complete on 30 May 2015 based on an estimated 1 December 2014 construction start date. It showed demolition would commence on 22 December 2014 and be completed by 5 January 2015, when concrete work would commence for three weeks. Metal building work was set to begin the last week of concrete work, i.e., 19 January 2015. (R4, tabs 22, 189)

4

On 20 November 2014, MULE's project superintendent sent an email to the Army's contract specialist, Sergeant First Class (SFC) Brandon Cooper, stating: MULE has a "Metal building contractor" that "would very much like to build this project with us"; this contractor is not "IAS certified" as required by the specifications; the contractor has offered to have an IAS certified contractor "build the frame steel" for it; and MULE is "asking if this will be ok to proceed with or maybe waive the IAS certification all together." SFC Cooper responded by email with a copy of his message also sent to the Army's contracting officer (CO) that, "[i]n accordance with the specifications of the contract, the work must be performed by an IAS certified company" and "[w]e will not waive this requirement." According to MULE's CEO, the contractor referenced in its project superintendent's email was not PEMB. (R4, tab 190; tr. 1/220-23)

On 9 December 2014, the Army CO issued to MULE the NTP, which stated "[y]ou are to commence work within 10 calendar days after receipt..., prosecute the work diligently and complete the project not later than 180 calendar days after [NTP] receipt" (R4, tab 25 at 3). As of 9 December 2014, MULE had submitted to the Army only six contract submittals: performance and payment bonds, accident prevention plan, superintendence by contractor, progress schedule, quality control plan and certificates of insurance. None of these submittals pertained to subcontractors or materials. (R4, tab 5 at 67-68, tab 146 at 1-3; tr. 1/216-17)

From contract award through issuance of the NTP, MULE's attempts to contact PEMB, its planned metal building and concrete subcontractor, to enter into a written subcontract were unsuccessful. MULE's CEO was "incredibly concerned" and "going ballistic." He began looking for a subcontractor "to replace that subcontractor that was MIA." (Tr. 1/218-20)

On 30 December 2014, the contract progress report prepared indicated that, as of that date, 1.42% of the project had been completed by MULE, i.e., MULE simply had furnished the required bond (R4, tabs 195, 197). According to various progress reports prepared, MULE considered itself to be on a holiday break until 5 January 2015 (R4, tab 197).

On 5 January 2015, 1LT Alexander Carlton, Battalion Engineer for the 3/160th, the Army component utilizing the hangar, participated in a site visit with MULE's superintendent. The superintendent told 1LT Carlton that a decision had been made that sewer re-rerouting was not to be part of the contract work. 1LT Carlton sent an email to CO Lynda Bush the same date stating "[w]e really do not want this to get eliminated because then the man hole cover for that line would be inside of the new enclosure. (R4, tab 198) CO Bush responded the next day that "it's in there" and referred 1LT Carlton to sheet three of the contract drawings (id.). 1LT Carlton replied that he saw "the sewer re-routing was indeed on the design drawings, but...could not find any information about it in the solicitation paperwork." He stated that MULE's

superintendent said he believes it was removed from the scope of work sometime in September and that it was not part of the scope of work when they submitted their bid. 1LT Carlton noted that Jacob Whitehurst, the CO's representative (COR), told MULE's superintendent to submit a request for information (RFI) to the CO to "get it included in the project again," but he was not sure "as to what the status of that is." CO Bush responded the same date that she believes previously "it was an additive but that was changed when it was resolicited" and thus "[i]t should have been in the drawings," but we "will look." CO Bush immediately sent an email to SFC Cooper, contract specialist, asking him to take a look at the solicitation and drawings that were put out to bid. Within an hour, SFC Cooper replied that there was nothing in the solicitation with respect to rerouting, but "it shows the location of the new manhole cover clearly on pg 4 of the drawings" and "details the modification and pipe connection to the new manhole on pg 5." (R4, tabs 193, 198-99; tr. 1/45-50)

As of 12 January 2015, MULE was significantly behind its proposed schedule. Considering the NTP issued one week later than planned in the schedule, MULE was to have completed the demolition work by 12 January and be commencing three weeks of concrete work, during which metal building work was to begin. MULE, however, had no subcontractor to perform either concrete or metal building work and had not submitted a single subcontractor or material submittal to the Army. MULE's CEO "had no thoughts that [MULE] wouldn't be given a no-cost change order" to "extend the time of the project." While he knew that the government needed this facility as quickly as possible, he was aware the project "had been sitting there for at least a year, if not longer, while it was rebid" so he did not think "getting it done by...the 30th of May, was absolutely and positively essential." (R4, tabs 22, 189; tr. 1/216-18, 286-87)

On 13 January MULE met with SFC Cooper, the contract specialist, to discuss mobilization. According to MULE's CEO, SFC Cooper told him that sewer rerouting was part of the contract and, when he "violently disagreed," SFC Cooper asked to see the bid documents in MULE's possession. (R4, tab 152; tr. 1/54-56) By email dated 20 January 2015, MULE's CEO advised SFC Cooper that the size of the electronic file containing the plans bid exceeds the allowable limit for MULE's email, but MULE had sent him an invite to Dropbox, a website MULE had used to obtain subcontractor proposals for the project, where the full drawings were set forth. MULE's CEO added that: the COR could view a hardcopy of the 5 May 2014 plans at the jobsite; the only version of the plans in the possession of MULE was one dated 5 May 2014; and the first amendment to the contract expressly stated that the bid alternate relating to new manhole and sanitary sewer "has been eliminated." Three days later, on Friday, 23 January 2015, MULE's CEO sent SFC Cooper another email asking if he could meet on Monday or Tuesday "to figure out where we are going on the Hangar project" and stating "I've got things on hold right now until we determine what we're going to do on the sewer and manhole." SFC Copper responded immediately by email that he would be out for the next two weeks, but was leaving a message for CO Bush (who was scheduled to be back on Monday) to contact MULE to arrange a meeting.

SFC Cooper promptly emailed the CO about the requested meeting, stating "those drawings include the rerouting of the sewer and man hole," but MULE says its "bid was based on a different set of drawings that did not include the sewer plans." (R4, tabs 27, 204; tr. 1/56-59, 66-67, 73)

By email dated Monday, 26 January 2015, CO Bush informed MULE that her office did not have access to "Dropbox" (R4, tab 28). On 27 January 2015, MULE's CEO met with COR Jacob Whitehurst per the protocol for resolving issues that was set forth by CO Bush in a conversation with MULE's superintendent. According to MULE's CEO, during the course of this meeting with COR Whitehurst, he discovered that the COR was using a set of plans with a different date from the plans furnished to MULE and he requested MULE receive a copy of the COR's plans, but was never supplied a copy. As of 31 January 2015, MULE had mobilized and erected a fence at the site but performed no demolition or other contract work. (R4, tab 31 at 7, tab 152 at 9, tab 203; tr. 1/59-60)

By email dated 11 February 2015, CO Bush advised MULE that: the manhole cover and sewer line are included in the drawings set forth in the solicitation; it was her understanding that MULE used "a different set of drawings" in bidding; and she wished to know who provided those drawings to MULE. CO Bush directed MULE to provide to SFC Cooper on or before 18 February a copy of its bid form, all worksheets and other data used in preparing MULE's bid, subcontractor and supplier quotations, and any other evidence of how the mistake occurred and the bid intended. (R4, tab 32)

MULE's initial progress schedule indicated that "HVAC Mechanical" work constituted 35.68% of total project work and was to commence about 9 February 2015, but MULE did not furnish its contractually-required "Electrical submittal – Munters unit, Air distribution & ductwork," for approval until 13 February 2015. The Munters unit was a dehumidification system and associated ductwork with a long-lead time because it was being manufactured in Europe and shipped to the United States. While MULE believed it might take six weeks to obtain approval of a complicated submittal such as that for the Munster unit, it did not furnish the submittal to the Army prior to 13 February because:

> We were trying to nail down who was going to do what. We had subcontractors that were AWOL. We had subcontractors that I had to go back and renegotiate pricing on, to do deducts on it. And one of those was the one that submitted the HVAC Munters unit.
>
> This subcontractor actually kept on bugging me, you know. We need to go ahead and submit this. This is an early lead time item – or is a long lead time item. We ended up submitting it in February, but that's because the

7

final contract with this – with Terrell Heating & Air Conditioning wasn't actually accomplished, I believe, until February....

(Tr. 1/323) MULE's submittal was for a Munters unit matching the Mechanical Plan with the return air duct on the "right" or eastern side of the unit. (R4, tab 2 at 22-24, tab 5 at 7-8, 67-68, tab 50 at 1, tab 146 at 7, tab 189 at 1-2, tab 401 at 147-50; tr. 1/140-45, 217-18, 309-10, 316-19, 321-24, 327-28)

By letter to the CO dated 16 February 2015, MULE advised:

Apparently, there was a major mix-up on Plans and Specifications for the HAAF Hanger 7902. The only copy of the plans and specs that we have were downloaded off the Army Single Face to Industry Acquisition Business Web Site following the advertisement on FBO. Those drawings are labeled H-1859 and have the notation "For Construction 05/05/14" on the bottom right corner of each page. Further, the sanitary sewer and manhole drawings have the notation, "All demolition (or construction) work shown on this drawing shall only be performed as a bid alternative with approval by owner's project manager" on sheets CD101 and CG101....

MULE proposed on the project without the new sanitary sewer and manhole. However, the bid alternate with those items apparently is required. We've determined that leaving the sanitary sewer and manhole as is presently, is dangerous to workers inside the building due to the methane gasses from the system.

In our last meeting with Jacob Whitehurst..., we found that there is a more recent set of drawings than the ones that we have. . . . In order to insure that we have the latest plans and specs to deliver the complete order, MULE requests that we be provided with those plans and specifications as soon as possible....

As requested, I have attached the bid from my file. However, any additional worksheets are not really applicable until we get the current plans and specs so we can check for differences. We have made preparations to proceed with the alternate bid but need the updated plans

8

and specs to proceed. In the meantime, we have put all present plans on hold until this issue is resolve.

(R4, tab 30 at 8-11) After being unable to supply the remaining documents requested to the Army by "Dropbox," flash drive, or compact disc, MULE created a hard copy of the documents to present to CO Bush, SFC Cooper, and COR Whitehurst at a meeting on 25 February 2015. By email dated 24 February, the CO informed MULE "it is my understanding that an older set of drawings were used H-1743, not the drawings specified in the solicitation, H-1859," and please "[l]et's get all the drawings together to review them." The next day, MULE met briefly with CO Bush and other Army personnel. According to the testimony of MULE's CEO, CO Bush said MULE had been operating off the wrong documents, wanted to know where MULE obtained its documents, said she would make a decision on the matter, and left. The contemporaneous daily report prepared by COR Whitehurst, however, stated CO Bush directed MULE to "resume work with drawing that was used for [its] BID proposal." (R4, tabs 29, 31-32, 213 at 4; tr. 1/67-69, 76-77) As of 26 February 2015, MULE had performed less than five percent of the contract work, i.e., only bond and mobilization. Demolition work had not begun. (R4, tab 213 at 8)

On 10 March 2015, CO Bush sent MULE an email simply stating: "The hangar will be built as bid." MULE's CEO says he did not know whether CO Bush meant the hangar was to be built as MULE had bid the project, as CO Bush apparently intended it to be bid, or as another bidder had bid the project. The next day, MULE sought clarification but SFC Cooper was away and CO Bush did not respond. By email dated 18 March 2015, CO Bush asked MULE's CEO to please provide the status of the hangar work because "[t]he command would like to know when work will begin." The next day, 19 March 2015, MULE's CEO replied "[w]ork should begin soon" and he would like to meet with the CO on 23 or 24 March 2015. A day later, on 20 March 2015, MULE's CEO sent SFC Cooper an email stating he realized he was just getting back but desired a meeting to discuss if the sanitary sewer system and manhole will not be done at all or after MULE completed its work, whether the engineer of record can confirm that the enclosure of the manhole poses no dangers to life, safety, or health, and whether an extension of overhead and time for project will be considered due to project being on hold because of manhole. SFC Cooper responded on 23 March 2015 that the "structure is to be built as bid" as "discussed in the meeting we had before I left" and the "engineer of record has reviewed the drawings and can confirm that it poses no dangers to life[,] safety or health." (R4, tab 33 at 3, 5, 8-9, tab 220; tr. 1/81-82) A week later, on 31 March 2015, CO Bush sent MULE's CEO an email asking simply "[w]hen will work begin" (R4, tab 33 at 1). In an email reply the same day, MULE's CEO stated there would be a subcontractor kickoff meeting the next week and a "sub will start shortly after" (id.).

MULE had not been able to contact PEMB during January, February or March of 2015 and had no subcontract for the performance of concrete and metal building

9

work on the project. MULE's CEO testified that MULE heard through a third party in March that PEMB had gone out of business, MULE has no idea when PEMB went out of business and did not know the reason why it went out of business. On 5 April 2015, MULE entered into a subcontract with Dayenesi, Inc., to perform the project concrete and metal building work. (R4, tab 394 at 1, tab 401 at 118-19; tr. 1/229-30, 232)

As of 14 April 2015, MULE had not performed any demolition or construction work on the project or provided the Army with the remaining contractually-required submittals for the project, except for the Munters unit submittal furnished on 13 February 2015 (R4, tab 34 at 4, tabs 224, 226). On 15 April 2015, the Army issued MULE a contract discrepancy report (CDR) based on its failure to perform work and furnish submittals required by the contract (R4, tab 34 at 4-5).

On 18 April 2015, MULE furnished the Army its first submittal with respect to a subcontractor (standard form (SF) 1413)) for its newly obtained metal building and concrete subcontractor, Dayenesi (R4, tab 35 at 2-6, tab 146 at 7). Eleven days later, on 29 April, four months after demolition was to have begun, a subcontractor, Aiken-Harper, initiated demolition at the site by removing ceiling light fixtures (R4, tab 229 at 4, tab 390 at 1). On 30 April 2015, MULE furnished a second subcontractor submittal for Terrell's Refrigeration, Heating & Air Conditioning (Terrell), the entity responsible for installation of the Munters unit (R4, tab 38 at 1-5, tab 146 at 7). The next day, on 1 May 2015, MULE also furnished for approval metal building product data submittals (R4, tab 146 at 7). With the exception of removal of the light fixtures and delivery of some equipment to the site, MULE conducted no work at the site from 1 April 2015 to 28 May 2015 (R4, tabs 229-33, 390 at 1-5).

In May to June 2015, Dayenesi prepared, MULE reviewed and the Army approved MULE's Transmittal No. 0012, which contained shop drawings for the metal building (tr. 1/305-06; R4, tabs 44, 146 at 7). The northeast corner of the Primary Steel Location Plan and the Roof Framing Plan of the metal building shop drawings both contained a detail similar to the Roof Framing Plan in the contract drawings (horizontal hash marks similar in appearance to a horizontal "H") indicating the northeast corner required the addition of a column (*compare* R4, tab 2 at 20, *with* R4, tab 44 at 6-7; tr. 2/126, 2/201-02). With respect to the metal building side panels that intersect with the concrete curb, the submittal did not separately describe, in writing, any variation from the contract requirements or otherwise note any ambiguities in the drawings concerning the height of the curb. Rather, drawings E5 through E8 depicted a finished curb height of 35.1 feet above the fixed point with none indicating a uniform "six inch curb height." Having a uniform curb height 35.1 feet above the fixed point was of import because the curb constituted the point at which the metal building wall panels joined or intersected the ground. (R4, tab 44 at 9-12; tr. 2/29, 190-91) With respect to the 33' x 16' overhead coiling door, the submittal asked "PLEASE VERIFY HEADER LOCATION FROM CURB OR BASE ELEVATION" (R4, tab 44 at 9). In approving the submittal, the Army set forth a response to the coiling door inquiry in

10

red font within a red, cloud-shaped rectangle. The Army stated: "16'-0" from top of curb." In separate box with an arrow pointing to the cloud shaped rectangle, the Army further stated: "Note: Actual door height may vary depending on door mfr. Selected. Mfr. installation details relative to curb location will determine finished door height." (R4, tab 44 at 9; tr. 2/197-99)

On 1 June 2015, MULE submitted a revised work progress schedule with a completion date of 5 November (R4, tab 51). The next day, on 2 June 2015, the Army approved the Munters submittal (R4, tab 146 at 1). The same day, a subcontractor for Dayenesi, Advance Concrete, began cutting concrete (R4, tab 390 at 5). On 5 June 2015, MULE ordered a Munters unit matching the Mechanical Plan with the return air duct on the right or eastern side of the unit (R4, tab 146 at 1, tab 401 at 149-50). The Army approved MULE's revised schedule on 18 June 2015 (R4, tab 56). Cutting of concrete and performance of other concrete work continued for much of the month until lack of prefab rebar for pillars halted concrete work (R4, tab 390 at 5-9).

In early July, MULE learned that it would be about another five weeks before receipt of the metal building components and that its subcontractor would begin taking down existing metal needed to be removed in three weeks. It also recognized no more concrete work could occur without rebar for the pillars, which was being cut and bent offsite. (R4, tab 390 at 8-9) On 7 July 2015, MULE submitted to the Army its anchor bolt plan, which stated with respect to installation of a metal column in the northeast corner of the building addition that:

> This column will be mounted directly to existing slab. No curb or pedestal.

(R4, tab 64 at 1, 6, tab 146 at 7) On or about 20 July 2015, MULE received the rebar necessary to continue with concrete work (R4, tab 146 at 10-11). During the following week, Perkins Concrete, a concrete mason subcontractor, tied steel together and performed other preparatory work for concrete pour (*id.* at 11-12). Concrete work continued from 3 August through 25 August 2015 (*id.* at 13-16). During the weeks of 17 and 24 August 2015, MULE installed a concrete curb along the perimeter of the southern and eastern exterior walls. Due to the decrease in elevation from the southwest corner of the building to the southeast corner of the building, the curb sloped from a high point in the southwest corner to a low point in the southeast corner. Similarly, due to the decrease in elevation from the northeast corner of the building to the southeast corner of the building, despite being a uniform height above the ground, the curb sloped from a high point in the northeast corner to a low point in the southeast corner. (Tr. 1/354, 2/129-30, 193-96, R4, tab 2 at 11-12, 14, tab 297 at 4-5, tab 390 at 15-16, tab 403 at 1-4)

On Wednesday, 27 August 2015, Dayenesi's subcontractor, Metal Building Maintenance (MBM), started the removal and demolition of the existing metal canopy

and purlins. This work continued through 18 September 2015. (R4, tab 390 at 17-19) The components of the metal building arrived after demolition of the existing metal canopy (tr. 2/93, 97, 155-56, 163; *see* R4, tab 390 at 19-20). During the four weeks following removal of the existing metal canopy, MBM (Dayenesi's subcontractor) reinforced the existing metal structure by welding steel plates and clips onto the beams and rafters (R4, tab 390 at 20-23). From 17 through 23 October 2015, Miller Painting Company painted the steel columns and rafters (*id.* at 24).

As of 21 October, 2015, MULE's revised progress schedule indicated it was to have completed over 97% of the project work. MULE, however, had only completed 21.53% of the work. (R4, tab 51 at 5, tab 285 at 6)

On Monday, 25 October 2015, Terrell received the Munters dehumidifier. At time of delivery, MULE had completed less than half the work to be performed on the metal building. MULE could not begin installing duct work for the Munters unit due to lack of a completed roof and side panels for the metal building, plus other reasons such as a need to extend the concrete pad that had been poured for the unit. During the week of Munters delivery, MBM installed purlins for the metal building. (R4, tab 294 at 6, tab 390 at 25; tr. 2/141-50)

During the month of November, Dayenesi and its subcontractor (MBM) continued installing purlins, support beams and rafters, and installed roof panels and insulation. The electrical subcontractor (Aiken-Harper) began installation of conduit. (R4, tab 390 at 26-29)

During December 2015, MBM finished installing roof panels and then engaged in "seaming" of those panels. Aiken-Harper continued installing conduit throughout the structure. On 21 December 2015, Dayenesi's concrete subcontractor completed work on the concrete slab for the dehumidifier. Two days later, on 23 December, the dehumidifier was placed on its pad. The same day, MBM began installing side panels on the building. (R4, tab 390 at 28-33)

When Dayenesi and MBM started installation of side panels, the sloping nature of the curb became obvious and they realized action needed to be taken. To remedy the problem, Dayenesi's concrete subcontractor raised the height of the curb in places to provide a level surface for the metal building side panels. It added no more than 6 inches of additional concrete to 107 lineal feet of the concrete curb to make the top of the curb level across the eastern and southern perimeters of the building. As shown by photographs taken by the Army, the total height of the completed concrete curb at no point exceeded 12 inches anywhere along the 107 lineal feet where additional concrete was poured to make the top of the curb level across the eastern and southern building perimeters. (Tr. 1/354, 2/129-30, 193-96, 227-28; R4, tab 403 at 1-4, tab 404; *see* R4, tab 297 at 4-5)

12

On 6 January 2016, the COR prepared a daily report stating:

> Received a call from Supt that the largest roll-up doors
> ordered was [sic] the wrong size and that the doors/frames
> will have to be cut to be retrofitted to be installed. I
> informed the Supt to wait on the installation of this until I
> received OK to proceed from [C]O.

(R4, tab 338 at 4, tab 390 at 34) Five days later, on 11 January 2016, the COR
prepared a daily report which stated:

> Supt informed me that the sub-contractor re-installed the
> headers for the proper height required for the roll-up door
> installation at no cost to the GOV.

(R4, tab 342 at 2, tab 390 at 34, 36) The next day, 12 January, MBM completed
installation of the side panels and Terrell began installing ductwork for the dehumidifier
(R4, tab 390 at 36). On 14 January 2016, Action Overhead Door continued installation
of the 33' overhead door (*id.* at 37). Two days later, on 16 January 2016, MULE
submitted to the CO a change order request pertaining to the header beam for an
overhead coiling door stating as follows:

> There have been three instances where we have needed to
> request a change from the government. All three of these
> requests have been documented and approved by your staff
> in order to keep the project moving forward. The
> following are the listed changes.
>
> ....
>
> 3.  The plans and specifications called for a 33'x 16'
>     overhead coiling door to be installed in the new
>     structure. However, the plans did not have the correct
>     door opening in order to install the door. We needed
>     to drop the header beam 12 inches in order to get the
>     proper clearance to install the door.

(R4, tab 343 at 2) On 19 January 2016, the COR prepared a daily report which stated:
"Received message from [C]O that MULE...was charging the Government for things that
[were] discussed to be done by Contractor at no cost to the Government" (R4, tab 344 at 3).

During the last half of January 2016, MULE's subcontractors were installing light
fixtures, door hardware, and trim (R4, tab 390 at 37-38). The first two weeks of February
2016, MULE's subcontractors built the ducts for the supply and return for the

13

dehumidifier, repositioned the dehumidifier, and completed the hookup for the dehumidifier. On 19 February 2016, Action Overhead Door completed installing the 33' roll up door. Other tasks being performed during the last two weeks of February included lightening protection, fire alarm, painting, and punchlist work. (R4, tab 390 at 40-49)

On 31 May 2016, MULE submitted 11 claims to the CO. First, MULE asserted the CO "delayed the work by directing the contractor to perform work [with respect to the sanitary sewer manhole] that was not 'expressly or impliedly authorized by this contract'" and "then compounded the issue by a 'failure...to act...within a reasonable time'" to "direct the contractor to perform the work as bid" (R4, tab 7 at 1). Second, MULE asserted it requested copies of the drawings being used by Army personnel, those plans were never presented to it, and it was therefore additionally delayed "NOT concurrent with the previous delay" (id.). Third, MULE asserted that its initial metal building subcontractor went out of business due to Army delay in the project and the Army is responsible for the increase in cost it incurred from bid price to actual contract work (id. at 2; see R4, tab 8 at 2). Fourth, MULE asserted the depth of the concrete apron was 18" rather than 15" and it was entitled to an additional $3,478.15 for cutting thicker concrete (R4, tab 8 at 2). Fifth, MULE asserted it was entitled to an equitable adjustment for the cost of an additional corner column (R4, tab 7 at 2, tab 8 at 2). Sixth, MULE asserted it was entitled to an equitable adjustment for the cost of changing out the return air duct on the Munters dehumidifier unit (id.). Seventh, MULE asserted entitlement to three months of delay costs due to the Army's delay in approving its Munters unit submittal (R4, tab 8 at 2). Eighth, MULE asserted it was entitled to an equitable adjustment for having had to pour additional concrete curb allegedly due to a misstatement on the drawings (R4, tab 7 at 2, tab 8 at 2). Ninth, MULE asserted that it was entitled to an equitable adjustment for removing bollards mistakenly shown as remaining in place on the drawings (R4, tab 7 at 2, tab 8 at 3). Tenth, MULE asserted entitlement to an equitable adjustment for altering the return air vent on the existing structure which interfered with the new roof (R4, tab 8 at 3). Finally, MULE asserted entitlement to an equitable adjustment for extra work it performed as a result of the plans purportedly not having "the correct door opening to install" the "33' x 16' overhead coiling door" specified (R4, tab 7 at 2, tab 8 at 3).

On 29 July 2016, the CO issued a final decision denying claims one, two, three, six, seven, and eleven in their entirety (R4, tab 8). She granted claims four and ten in their entirety. With respect to claim five, she granted the contractor $1,914.04 on the theory the column was missing from the plans but did not require a footing or pedestal. (Id. at 2) Finally, with respect to claim eight, she granted the contractor $4,992.67 on the grounds that this should be "a shared cost" because, while there were six to eight contract drawing notes indicating a level curb with an elevation of 35.10', there was one note referencing a 6" curb (id. at 3).

MULE timely appealed the CO's final decision to this Board. The Board docketed MULE's appeal as ASBCA No. 60854. By letter dated 22 December 2016,

MULE requested that its 11 claims be separated into 11 appeals and that each appeal be processed pursuant to Board Rule 12.2. The Board's Recorder granted MULE's request, assigning to claim one ASBCA No. 60854 and ASBCA Nos. 60967 through 60976 respectively, to the following 10 claims. On 13 January 2017, the parties requested MULE's 11 appeals pursuant to Rule 12.2 be bifurcated, with the Board conducting proceedings only with respect to entitlement. The Board granted the parties' motion. The Army subsequently stipulated to entitlement in ASBCA Nos. 60969 (claim four) and 60975 (claim ten) and we dismissed both appeals since the CO had provided MULE's full requested relief by unilateral contract modification. The Army also stipulated to entitlement in ASBCA No. 60974 (claim nine), which we sustained and returned to the parties for negotiation of quantum.

Trial was held in Savannah, Georgia, on 16 and 17 February 2017. Thereafter, MULE submitted a post-trial brief, the Army submitted a response to MULE's brief, MULE filed a reply to the Army's response, and the Army filed a sur-reply to MULE's reply brief.

## DECISION

### ASBCA Nos. 60854 & 60967 – Manhole & Differing Drawings Delay Claims

At trial and in its legal briefs, MULE contends that the Army delayed it by 192 days or more (i.e., over six months) commencing on or before 23 January 2015 by stating that the contract required MULE to perform sanitary sewer rerouting (thereby removing a manhole from within the perimeter of the new building addition) and not providing it with copies of one or more sets of contract drawings within the Army's possession that were not supplied to bidders for purposes of bidding upon the contract that was awarded to MULE but were allegedly being used by Army personnel. MULE states the CO's delay in responding to its assertions that it was not required to perform the sanitary sewer work under the contract and in addressing health and safety issues raised by MULE regarding existence of a manhole (with accumulating methane gas) within the perimeter of the new building addition "led to the suspension of work" by MULE and the Army's actions "were the sole and proximate cause of the suspension" and "per se unreasonable" delaying MULE for an unreasonable period of time and causing it additional expense and injury. (App. br. at 21-24; *see id.* at 16)

Citing *John A. Johnson & Sons, Inc. v. United States*, 180 Ct. Cl. 969, 986 (1967), MULE correctly notes at page 23 of its post-trial brief that a contractor is only entitled to recover under the Suspension of Work clause (FAR 52.242-14) if "the Government's actions are the sole proximate cause of the Contractor's...loss, and the Contractor would not have been delayed for any other reason during that period." It adds a contractor "cannot recover under the Suspension of Work clause if the delay in question was concurrent." MULE, however, does not address specifically in its briefs

15

the Army's contention here that there was "concurrent delay" by MULE during the period in question.

The record before the Board shows that the initial work to be performed under the contract concerned concrete and the metal building to be erected. At the time of contract award in September 2014 (and through 4 April 2015) MULE was incapable of performing concrete and metal building work itself and had no legal relationship with a subcontractor who had agreed to perform any of that contract work. While MULE's CEO testified that MULE bid the contract based upon an oral quote from a prospective subcontractor that he believes was obtained by a part-time estimator, there is no contemporaneous evidence in the appeal record relating to such an oral quote and MULE did not call the part-time estimator to testify at the hearing. MULE's CEO did not provide in his testimony the name of the individual who is said to have furnished the oral quote to the estimator and was unable to furnish any contact information for the prospective subcontractor. MULE's CEO did testify during trial that after contract award MULE was never able to contact the prospective contractor from whom it said it obtained the quote and that, after NTP, MULE's CEO was "incredibly concerned" about lack of a subcontractor, "going ballistic" with respect to that issue, and looking for a subcontractor "to replace that subcontractor that was MIA." Accordingly, even if the Board were to conclude that the Army's confusion concerning whether rerouting of the sanitary sewer was part of the required contract work and delayed actual contract work, the entire period of December through March there was "concurrent delay" of the contract work by MULE, i.e., it did not possess the capability itself or necessary subcontractor for performance of the contract work required. While MULE retained a metal building and concrete subcontractor the first week of April, no significant work on site commenced by that subcontractor until early June due to no action by the Army. Since MULE has not presented an analysis of or clear apportionment of the delay and expense attributable to each party here, it is barred from any recovery and we deny these two claims. *E.g., William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed. Cir. 1987); *Versar, Inc.,* ASBCA No. 56857 *et al.,* 12-1 BCA ¶ 35,025 at 172,127.

We note in passing that it is admirable for a contractor to be concerned about the safety of the military personnel who would be working in the building addition, but all of the bidders here knew prior to submitting their bids that there would be a manhole within the perimeter of the new building addition and could have inquired about the safety of such a situation prior to award of the contract if they had serious concerns it was inherently dangerous. We further note the Army's contemporaneous documents show that any confusion over drawings and performance of sewer work ended by 25 February 2015 and it was communicated to MULE on that date that it should proceed with performance of the work as it had bid, i.e., without inclusion of performance of the sewer work. This was reiterated to MULE several times in March to no avail because it had no capability at that time to begin performance of the work required.

16

ASBCA No. 60968 – Increased Cost of Dayenesi work

MULE contends that it is entitled to recover from the Army the increase in costs it experienced as a result of retaining Dayenesi as its metal building and concrete subcontractor. MULE asserts it obtained a quote from "PEMB" to perform metal building and concrete work on the project, but was "forced to secure a replacement subcontractor to perform the anticipated PEMB work" due to delay of contract work caused by the Army. (App. br. at 25-29)

The record in this appeal, however, shows that MULE never entered into a subcontract with PEMB and that PEMB may not even have been in business on the date the Army contract was awarded to MULE. Between award of the Army contract in September 2014 and the April 2015 date MULE entered into a subcontract for the performance of metal building and concrete work with Dayenesi, MULE was never able to contact PEMB. Accordingly, there is no basis for us to conclude that MULE ever possessed a subcontractor to perform metal building and concrete work at time of award of the contract or shortly thereafter. Based on the record, the Board can only conclude that MULE was madly scrambling to find a metal building and concrete subcontractor when the NTP was issued by the CO and that such efforts continued through 4 April 2015.

MULE entered its first and only subcontract for metal building and concrete work with Dayenesi on 5 April 2015. The prices set forth in that contract were agreed upon by MULE and Dayenesi. MULE has not alleged nor shown that there was any act by the Army delaying Dayenesi's performance of its subcontract work. Thus, there is no basis for finding that the Army was responsible for the higher prices charged by Dayenesi to perform contract work.

MULE failed to procure a subcontractor to perform metal building and concrete work prior to issuance of the NTP and did not do so until approximately six months after contract award. It is well established a contractor is responsible for "ensuring that the labor, materials, and equipment necessary for timely delivery are available to it." *E.g., Sach Sinha & Associates, Inc.*, ASBCA No. 46916, 96-2 BCA ¶ 28,346 at 141,563. "If a contractor fails to so ensure, it must suffer any consequences arising from that failure." *Id.* (citing *B&H Constr. Co.*, ASBCA Nos. 24558, 24587, 80-2 BCA ¶ 14,568 at 71,841). Accordingly, we also deny MULE's appeal seeking the difference between the cost MULE says it set forth for such work in its bid during fall 2014 and the cost it subsequently agreed to pay for that work when it actually entered into a subcontract with Dayenesi in April 2015 for the work.

17

MULE contends that it is entitled "to its costs arising from...placing a 'faux column' at the northeast corner of Building 7902." MULE asserts that the column "was necessary for attachment of the exterior skin of Building 7902," but was not shown on the contract drawings. (App. br. at 30-31)

As found above, no column appears in the northeast corner of the "foundation plan" for the building addition because the column did not require installation of a concrete footer or pedestal as part of foundation work. A column, however, appears in the northeast corner of the "Roof Framing Plan," sheet 20 of the drawings, as MULE's project superintendent and the Army's architect testified at trial. Further, the drawings submitted by Dayenesi, the metal building subcontractor, and reviewed by both MULE and the Army, contain a drawing similar to sheet 20 with horizontal hash marks that are similar in appearance to a horizontal "H" depicting the addition of a column in the northeast corner and the anchor bolt plan submitted to the Army during July 2015 by MULE and Dayenesi showed installation of a column in the northeast corner of the building that was to "be mounted directly to existing slab" with installation of "[n]o curb or pedestal." Dayenesi and MULE, therefore, also both contemporaneously construed the contract as requiring installation of a column in the northeast corner.

In sum, MULE's contract expressly required the installation of a column in the northeast corner of the building addition. Accordingly, installation of a column at that location could not constitute a constructive change to the parties' contract, as asserted by MULE.

In her final decision, the Army CO granted "in part" MULE's claim for an equitable adjustment concerning installation of the northeast corner column based on lack of a column on the Foundation Plan. At trial and in its legal briefs, the Army asserts the CO did so in error. MULE asserts, however, in its post-trial brief that "binding action has been taken within the scope of the CO's authority" and "[h]igher authority...cannot reverse the statements and actions of the [CO]." (App. br. at 32-34) As the United States Court of Appeals for the Federal Circuit explained en banc in *Wilner v. United States,* 24 F.3d 1397 (Fed. Cir. 1994), however, the Contract Disputes Act makes "it clear that when suit is brought following a [CO's] decision, the findings of fact in that decision are not binding upon the parties and are not entitled to any deference." In sum, on appeal, the contractor has the burden of proving both the fundamental facts of liability and damages *de novo. Id.* at 1401-02. The CO's determination granting in part MULE's equitable adjustment claim for installation of the northeast corner column, therefore, is not binding upon this Board. Rather, MULE was required to show at trial before the Board fundamental facts supporting liability with respect to its northeast corner column equitable adjustment claim.

MULE has failed to show facts here supporting its claimed entitlement to an equitable adjustment for installation of the northeast corner column. We therefore deny MULE's appeal seeking an equitable adjustment for installation of that column.

ASBCA No. 60971 – Accommodation of Return Air Duct on Munters Dehumidifier

MULE contends that it ordered the Munters dehumidifier unit depicted on the contract plans, but when the unit arrived, "the return air duct was on the wrong side" (R4, tab 297). According to MULE, "[u]pon receipt [of the Munters] Unit, it became obvious that the discharge return air duct was located on the right side of the Unit and the area into which the specified model was to be installed could not accommodate a return air duct on that side." MULE asserts it is entitled to an equitable adjustment in its contract price because a "differing air duct [on the Munters dehumidifier unit] caused changing of the openings within the metal building as well as [the furnishing of] additional concrete needed to [enlarge the pad and] move the unit to the correct opening." (App. br. at 35; R4, tab 152 at 2-3)

As found above, the Munters dehumidifier unit model set forth in MULE's submittal approved by the Army, the Munters dehumidifier unit model MULE actually ordered, and the Munters dehumidifier unit model received by MULE in October of 2015 all had the same exterior configuration – return air duct on the right or eastern side, which was the unit configuration on the contract's Mechanical Plan. Metal building shop drawings prepared by Dayenesi three months after the dehumidifier submittal, however, appear to have relied on the configuration of the unit set forth in the Floor and Roof Plans with the return air duct on the left or western side. The problem that arose after unit arrival, therefore, was not that an incorrect unit had been ordered or delivered. Rather, it was that in designing the metal building, Dayenesi was relying on a configuration different than that ordered by MULE, i.e., the configuration set forth in the Floor and Roof Plans, which was the opposite of the configuration set forth in the contract's Mechanical Plan.

As MULE's CEO testified during trial, the units with the right side air duct configuration and left side air duct configuration do not look anything alike and thus there was a "big time" glaring difference between the Mechanical Plan and the Roof and Floor plans. It is well established, "[w]hen two parts of a contract say very different things, as here, a patent ambiguity exists." *Merritt-Meridian Constr. Corp.*, ASBCA No. 48289, 96-2 BCA ¶ 28,348 at 141,568 (citing *Newsom v. United States*, 676 F.2d 647, 650-51 (Ct. Cl. 1982)). While MULE would now like to resolve the internal contract conflict by ignoring the Mechanical Plan with a right side air duct, bidders are not free to supply their own conflict resolution. Rather, they have an affirmative obligation to make appropriate inquiries to obtain a clarification from the government. MULE did not fulfill that obligation. The fact there were two subcontract trades involved here (Terrell/HVAC and Dayenesi/Metal Building) is immaterial in view of the obligation of the general contractor (MULE) to coordinate

19

the contract requirements. It is the obligation of the prime contractor to coordinate various parts of the contract work to guarantee that all required contract work is properly performed. *Id.; Okland Constr. Co.*, ASBCA No. 43986, 93-2 BCA ¶ 25,867 at 128,698.

MULE had to show at trial facts demonstrating Army liability for work to accommodate a Munters dehumidifier unit with right side return air duct. MULE failed to demonstrate any such facts. We therefore deny MULE's appeal seeking an equitable adjustment for work to accommodate a Munters dehumidifier unit with a right side return air duct.

## ASBCA No. 60972 – Delay in Approving Munters Dehumidifier Submittal

MULE contends that the Army delayed it three months by taking three and a half months to approve its Munters dehumidifier unit submittal. MULE appears to assert that commencement of work on the Munters dehumidifier unit was pushed into December due to delayed receipt of the unit resulting from delayed approval of the submittal. (App. br. at 37; R4, tab 8 at 2, tab 283)

As found above, however, when the Munters dehumidifier arrived on site on 25 October 2015, metal building work was less than 50% complete. MULE could not begin installation of the Munters unit in October due to lack of a completed roof, no building side panels, and no concrete pad for the unit. While the Munters unit arrived in October, Terrell did not begin actual installation of duct work for the Munters unit until 12 January 2016, the date that Dayenesi/MBM completed installation of metal building side panels.

MULE's contract did not require completion of documentation regarding the project's critical path. Based upon our analysis of the daily reports, progress schedules and other record documentation, however, Munters unit installation does not appear to have been on the project's critical path until sometime in January 2016. In sum, after arrival of the Munters unit in October 2015, it sat for two months without significant installation work because MULE was not ready or capable of commencing installation of that unit. Any delay in the October arrival of the unit, therefore, does not appear to have had any impact on the critical path of the project and caused no delay in overall completion of the project.

To establish a claim of government-caused delay, a contractor must show that there was a delay "proximately caused" by the government which "harmed" it and the "extent" of that delay. Such a demonstration requires a contractor to prove that the delay alleged occurred on the contract work's "critical path," i.e., affected overall contract completion. *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1313 (Fed. Cir. 2000); *Wilner*, 24 F.3d at 1397 n.5, 1401; *Kato Corp.*, ASBCA No. 51462, 06-2 BCA ¶ 33,293 at 165,086; *Gassman Corp.*, ASBCA Nos. 44975, 44976, 00-1 BCA ¶ 30,720

at 151,738. As the Board explained in *Precision Dynamics, Inc.*, ASBCA No. 50519, 05-2 BCA ¶ 33,071 at 163,920:

> It is not sufficient...for a contractor to show that the Government delayed completion of a segment of the work. Rather, in order for the contractor to recover, it must establish that completion of the entire project was delayed by reason of the delay to the segment.

MULE had to show at trial that any government-caused delay to delivery of the Munters unit was on the contract work's critical path and affected overall completion of contract work. MULE failed to make such a demonstration. Accordingly, we deny MULE's appeal with respect to Army delay in approval of the Munters unit submittal.

ASBCA No. 60973 – Equitable Adjustment for Extra Concrete Curb

MULE contends that "[n]othing in the contract drawings gave MULE any indication of the [height] of the concrete curb – other than the reference that 6 inches would be typical." MULE asserts that, "[i]n order to meet the demands of the contract drawings, [it] was required to place additional concrete in order that the new curb might approximate the 35.10 feet typical elevation" and is entitled to an equitable adjustment for such work. (App. br. at 38-41)

As found above, the contract drawings set forth grades above a fixed point indicating that the ground sloped, i.e. decreased in elevation from the southwest corner of the building to the southeast corner of the building and from the northeast corner of the building to the southeast corner of the building. Moreover, the contract drawings (sheets 11, 12 and 14) expressly state "EXIST. GRADE VARIES" and "DISTANCE FROM TOP OF CURB TO EXTERIOR CONCRETE VARIES," depict the curb as a straight line that accounts for the changes in elevation, and indicate the top of curb is typically 35.10 feet above the same fixed point used to measure the grade. Similarly, the metal building shop drawings submitted to the Army by Dayenesi (E5 through E8) depict a finished curb height of 35.1 feet above the fixed point with none indicating a uniform six inch curb height. Having a curb height 35.10 feet above the fixed point was of great significance because the curb constituted the point at which the metal building wall panels joined or intersected with the ground.

Dayenesi's concrete subcontractor ignored the elevations set forth on the drawing, warnings that existing grade varies, and drawing depictions of the curb as a straight line accounting for changes in elevation with top of curb typically 35.10 feet above the fixed point used to measure grade. It poured concrete for a uniform curb height of six inches during August 2015, which would result in there being space between the bottom of metal building panels and the curb, an unacceptable result for Dayenesi's metal building subcontractor.

21

After Dayenesi's metal building subcontractor told MULE's superintendent that the curb was not high enough for the metal building, the concrete subcontractor was told to return to the site to pour sufficient concrete to account for the change in slope or elevation and did so. While MULE presented testimony from its CEO that it was to pour no more than a 12 inch curb (tr. 1/158), but poured as much as 18 inches of curb, the Army presented photographic evidence that the completed curb at no point exceeded 12 inches in height.

We cannot find testimony that as much as 18 inches of curb was poured to be credible when there is photographic evidence of the curb not exceeding 12 inches. MULE therefore has not shown that it was required to pour more concrete than was required by its contract, which its CEO testified could be as much as a 12 inch curb.

To the extent other language existed on the contract drawings suggesting the curb was to be a uniform height of six inches, as MULE asserts in its brief, any such language expressly contradicted the language and depictions set forth on the drawings and discussed above stating top of curve was to be 35.10 feet above the fixed point that had been used to measure grade. As discussed above, "[w]hen two parts of a contract say very different things, as here, a patent ambiguity exists." MULE did not inquire about the curb height prior to bidding and therefore cannot now supply its own resolution of the conflicting language as mandating only a uniform six-inch high curb. Its metal building subcontractor understood the drawing requirements for the curb, as evidenced by the plans it submitted for the metal building, and it was the obligation of MULE to coordinate with the concrete subcontractor to ensure the required contract work was properly performed. *Newsom*, 676 F.2d at 650-51; *Merritt-Meridian*, 96-2 BCA ¶ 28,348 at 141,568; *Okland Constr.*, 93-2 BCA ¶ 25,867 at 128,698.

In her final decision, the Army CO granted "in part" MULE's claim for an equitable adjustment with respect to additional concrete curb stating:

> There was one note stated incorrectly in the drawing referencing a 6" curb, however there were 6-8 notes throughout the drawings indicating a level curb with an elevation of 35.10' and another note indicating the height from the top of the curb to grade varies. It is the Government's belief that this item should be a shared cost.

At trial and in its legal briefs, the Army asserts the CO acted erroneously in granting this claim in part. While MULE again asserts in its post-trial brief that binding action has been taken within the scope of the CO's authority and this Board cannot reverse actions of the CO (app. br. at 41-42), as we discussed above, when an appeal is filed following a CO's final decision, the findings of fact in that decision are not binding

and are not entitled to any deference. In sum, on appeal, the contractor has the burden of proving the fundamental facts of liability *de novo*. *Wilner*, 24 F.3d at 1401-02.

MULE did not set forth facts in the record here establishing Army liability for extra concrete curb work. This Board, therefore, denies MULE's appeal seeking an equitable adjustment for the additional concrete added to the initial curb pour.

### ASBCA No. 60976 – Equitable Adjustment for Installing Coiling Door

MULE contends that, on its overhead coiling door submittal, it asked the Army whether the header height should be measured from the base or curb elevation and the Army responded that the header is to be located "16' 0" from top of curb." MULE asserts that "[t]he net result was that the vertical opening for the overhead coiling door was significantly in excess of the 16 x 33 door" and it was forced to drop the header in order to meet the requirements of the drawings and specifications, entitling it to an equitable adjustment for the cost of that work. (App. br. at 44-46)

As found above, the Army's response to MULE's inquiry regarding the overhead coiling door was not limited to the few words MULE cites. The Army further told MULE:

> Note: Actual door height may vary depending on mfr.
> selected. Mfr. installation details relative to curb location
> will determine finished door height.

(R4, tab 44 at 9) Moreover, section 3.01 of the specification expressly stated with respect to coiling doors that the contractor, MULE, was to "[v]erify that opening sizes, tolerances and conditions are acceptable." Thus, the contract specification placed the burden of verifying opening sizes and conditions on the contractor (MULE), not on the Army, and the Army's response to the question set forth on MULE's coiling door submittal made clear that the door manufacturer's installation details relative to curb location would determine the finished door height. MULE was free to select any manufacturer of coiling doors it desired and the Army had no knowledge of which door manufacturer MULE actually intended to use. Different overhead coiling door manufacturers have differing installation requirements. The onus was on MULE to coordinate with its overhead door subcontractor and determine the finished height for the coiling door. The Army's response to MULE's submittal question did not relieve MULE of this legal obligation.

A contractor seeking an equitable adjustment has the burden of proving the fundamental facts of liability. *E.g., Wilner,* 24 F.3d at 1401-02. MULE did not set forth facts in the record here establishing Army liability for additional work to drop the header from the height MULE initially installed that header. Accordingly, the Board

23

also denies MULE's appeal seeking an equitable adjustment for installation of the overhead coiling door.

## CONCLUSION

We deny all eight of the appeals.

Dated: 20 April 2017

_Terrence S. Hart_

TERRENCE S. HARTMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60854, 60967, 60968, 60970, 60971, 60972, 60973, 60976, Appeals of MULE Engineering, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
